The next case is Jennifer Williams v. Alabama State University. Jamie Johnston is here for the appellate. Williams, Kenneth Thomas is here for the appellate, Alabama State University. Ms. Johnston, Ms. Johnston, you may begin. Good morning. May it please the court, thank you for having us. I'm joined today by my client, Ms. Jennifer Williams. Ms. Williams is a dedicated mother of two and an accomplished female working inside collegiate athletics in administration. She's really what you would call a rock star. In fact, according to NCAA recently, I looked, only 15% of all athletic directors in Division I colleges are female, and that is an increase of 6% over the last 10 years. They have a long way to go. Before arriving at Alabama State University, Ms. Williams worked as DePaul University's assistant athletic director for three years. She followed that at North Carolina A&T, where she worked for four years, both of those, as an associate athletic director. Both of those schools are Division I schools. I make that point about a Division I school because Division I are larger universities, their athletic programs are larger, and the responsibilities within athletic department and administration is significantly higher than some smaller Division II or Division III schools. After Ms. Williams left North Carolina A&T, she joined Alabama State University as its deputy athletic director. She worked in that position for over one year. Not only did Ms. Williams perform the job responsibilities of the deputy athletic director, she simultaneously served as the sports supervisor for three sports. She handled additional duties of secondary sport administration for two sports and worked as the liaison for human resources, the institutional advancement. Let's talk about the Equal Pay Act. Sure. Yes, sir. I was trying to give you that background as we segue into the Equal Pay Act claim. Okay. The person, the male who was appointed to replace her, according to Alabama State University, is clear from the record that he had more education, he had a Ph.D., and he had more experience in athletic administration. Thirteen years in athletic administration. Your Honor, I... So why isn't that sufficient to support their affirmative defense, that exception which provides the employer with that affirmative defense? Your Honor, if I may, I respectfully disagree with the position that Alabama State took in their brief that athletic director Cable has more experience. He simply does not and did not. When he was hired by Alabama State, he had no experience as an athletic director.  Ms. Williams, on the other hand, had worked at Alabama State University as its interim athletic director and as its deputy athletic director. And that compressed over two years' experience. Athletic director Cable did not. And before he arrived... I don't understand that. She didn't have any experience as an athletic director until she was hired as an athletic director, right? No, Your Honor. Respectfully, she worked on an interim basis for a year before she was hired as its official athletic director. Okay. I guess that seems... So could you address the education, I guess? I mean, it seems like their main argument is that they wanted someone with a Ph.D., they wanted, you know, they didn't want to specifically replace her. They wanted someone, you know, somewhat different. This is the person who applied. He demanded a 170 salary. They hired him. Yes, Your Honor. Focusing on education. If you will look at the job description, it does not require a Ph.D. In fact, it states that the preferred course of study is sports administration or athletic administration. Athletic director Cable has no degree in either of those. In comparison, Ms. Williams' degree is a master's degree, which was all that was required, and it is in the preferred course of study. Her degree, her master's degree was in athletic administration. Here's sort of a broader issue I have, and maybe it doesn't matter with respect to your claim. So she quits her job. She says, I don't want to be the athletic director anymore. I've got a better job. Sounds great for her. Then they've got to hire somebody to fill in her position. Why? I guess it seems like we're comparing apples to oranges. She quits the job. She doesn't want to do it anymore. They have to hire somebody. Why would they be compelled by the law to hire somebody exactly like her, pay that person the exact same amount of money? It seems very odd. It seems like this Equal Protection Act seems to be designed for you've got two teachers working at the same time. You can't pay one less than the other. Here, she doesn't want to work at Alabama State anymore. They've got to hire somebody. Why would we even care? Why would they care if they found a great person who has a Ph.D. they really like? Why would we say that they have to pay that person the same amount as they paid her when they have a reason to pay them more, I guess? Well, the Equal Pay Act is designed to prevent what has happened here. While she was working at Alabama State, she asked for increases. Those were denied. In fact, the chief of staff told her, be happy with what you're making as a female. The case law shows that if the salary is discretionary or if the applicant suggests a pay, as they allege here, pay me this, then that shows bias. The burden on Alabama State is significant under an Equal Pay Act claim. It is heavy. It is important, again, to emphasize that there was no requirement for a Ph.D. The preferred course of study was what was emphasized by Alabama State on both at the time when Ms. Williams applied and when Athletic Director Cable applied. Maybe this just seems odd to me, but why would we care about what they required in the job posting? Let me just give you a hypothetical. Let's say that she quits. She doesn't want to work there anymore. Nick Saban decides to retire from Alabama. He says, you know what? I really want to work at a historically black college. I see there's an Athletic Director position open at ASU. I'd really like to work there. But, you know, to make it work, it's going to require a little bit more money and I need like a housing allowance or something. And ASU is like, this is awesome. We can't believe this. This is great. Why would we care what they require? I mean, why would we care, I guess? Because we're trying to keep equality for women. If, as Ms. Williams did here, perform the same job as Athletic Director Cable, then they should be equally compensated for doing the same work. But she didn't want to work there anymore, though, is my point. I mean, I just don't – they had to hire somebody to replace her. Why would they have to pay that person the same money if they have different education, different experience? Why would they have to do that? Because in the job listing, they didn't require that educational experience. With all due respect, the education difference is because she had a preferred course of study. His education had nothing to do with performing the job duties of the Athletic Director position. There's plenty of case law that the employer has to tie back, whatever their explanation is, to the business at hand. So they have to show a correlation of, okay, well, so PhD in this correlates to the business this way. They can't here. It doesn't. His degree is in higher education. And focusing on their experience, the record shows that he had far less experience than Ms. Williams. If you look at it, she had one year as an Interim Athletic Director position before she took the official role as Athletic Director. She was a Deputy Athletic Director at the same institution for a year. She was an Associate Athletic Director for over four years at a Division I institution in comparison to Athletic Director Cable, who had three years and five months. Ms. Williams was an Assistant Athletic Director for three years. In comparison to Athletic Director Cable, he had seven months. The experience at Alabama State is important. He had none. And the case law will show that it is given deference when the experience is there, doing the same job before and doing it successfully. So as I understand your argument, there's a big difference between Jennifer Williams and Nick Saban, but there's not that big of a difference between Jennifer Williams and Jason Cable. I would say, well, I'm not going to speak to the Nick Saban comparison. I think Ms. Williams is a rock star. You're not comparing her to Nick Saban for the purpose of serving as an Athletic Director, right? No, we're comparing the two. But your argument, as I understand it, is there isn't that big of a difference between Jennifer Williams and Jason Cable to justify a $35,000 difference in pay. Is that your argument? Yes, Your Honor. I would like to add that Ms. Williams, again, and I hate to reiterate this, experience exceeds Athletic Director Cable's. I'll point out what the specific thing that Alabama State seems to focus on, on Cable's experience was he worked as a commissioner for the SWAC, and they seem to focus on that to elevate him. That is not running an athletic department at a Division I university. I get that argument. They're not the same person, right? Obviously, they're not the same person. Let me ask you this. Was there anybody who applied to Alabama State University for the Athletic Director position that would have taken the job for $130,000? I cannot answer that question. We know she doesn't want the job for $130,000 because she quit. She's left to go somewhere else. I guess my question, what is Alabama State supposed to do? They can't hire an Athletic Director for $130,000. Don't they have to increase the amount of pay that they're going to pay somebody? Not necessarily, Your Honor. Just to correct the record, her salary was $135,000 in comparison to his $170,000. The case law also shows— How are they supposed to fill the position for Athletic Director? They could, Your Honor. She was still working there, and I would ask the court to— So they could have negotiated with her and said—I mean, did she want to do that? Did she say, look, I'll stay if you up my salary? She asked multiple times for increases. But that was before she got the other job, though, right? She would not have taken another job if she was paid $170,000. When they advertised the position, did they advertise it at $135,000? Is this from Ms. Williams or Athletic Director? The position—I know he got $170,000 because he wouldn't come. He demanded $170,000 at the get-go. I'm asking what did they advertise the position for? In the job description, it said negotiable, which is different than when Ms. Williams was being considered for the Athletic Director position. That reflected $125,000. So they changed the job description when it became available and Athletic Director cable applied to be negotiable, where you will see in some case law that opens the door for bias and potential problems. All right. Thank you, Ms. Johnston. You've reserved some time for rebuttal. Yes, Your Honor. Thank you. We'll hear from Mr. Thomas on behalf of Alabama State University. Judge Brescia, Judge Wilson, I was thinking about Mal Moore, who carried $5 million in his back pocket. He wanted to do something for an HBCU and applied at Alabama State. Do you pass on Mal Moore? God bless his soul now. Good morning. I'm Kenneth Thomas, and I represent Alabama State University. Let's start off with the basic premise. All that the plaintiff is doing is quarreling with the wisdom of Alabama State University. Alabama State University is an educational institution. It wanted to have a terminal decree. It looks good in the catalog. It looks good for the Southern Association of Accreditation. So again, how can they dictate the criteria that the university wants to utilize? And if I may, it was so glossed over in the plaintiff's presentation, but when you look at Dr. Cable's experience at the SWAC, the Southwestern Athletic Conference, of which ASU is one of the 12 member schools, he was the senior associate commissioner, second in command, for two years. And what he did, and we have it at page 6 of our brief, and that is he provided the vision, leadership, and assistance with regard to all conference matters, corporate sponsorships, fiscal affairs, personnel. Well, these sound like arguments that ought to be made to a jury. Well, I will submit that to you, but the question would be whether or not a reasonable juror would question any of these. And so why shouldn't a jury have an opportunity to consider whether or not these differences, as far as their education and their experience, justifies a $35,000 difference? A reasonable jury might decide, yeah, Mr. Cable might have a Ph.D., but to justify a $35,000 difference, I don't see that much of a difference between the qualifications of Ms. Williams and the qualifications of Mr. Cable. I might think that it justifies it, but a reasonable jury might decide that, well, these differences don't justify a $35,000 difference in pay. Well, if I could, Judge Wilson, what was ASU to do? She left, and I might add, it is undisputed, she was the highest athletic director that ASU had ever paid. Yeah, she's not saying, though, as I understand her complaint, she's not saying that you paid Mr. Cable too much. She's saying you didn't pay me enough when I asked for a raise, that I should have been making $175,000. She doesn't have a problem with you paying Mr. Cable $175,000. She's saying you should have paid me $175,000 because I asked for a raise several times. Well, the job description that she applied for said $125,000. She asked after getting the job for a $10,000 raise. She got it. Yeah, well, Mr. Cable asked for more money, too. How come work for Alabama State if you pay me more than what you're offering? Well, Judge, at the end of the day, doesn't it get down to the art of the deal? So you denied Ms. Williams' request for more money, but you granted Mr. Cable's request for money. Why isn't that something that the jury could take into consideration? He said negotiable. If it did not say negotiable, would Dr. Cable have applied? Would he have applied for a position for $125,000? So her pay wasn't negotiable? Well, no, per the job description. And I may add, I know just even on my watch, for the last 10 years, it's been $125,000. They were both the third lowest paid, I think, for the conference or something like that? They were, and they still are. Yeah. So under this law, you do have a burden under this law. And if anybody's here from the EEOC or listening to this from the EEOC, I thought your amicus brief was great. So thanks for following your amicus brief. The EEOC's brief makes the point that you have a burden to prove that you relied on reasons other than sex for making this determination. And they don't have to be like we might not agree that those reasons are particularly good, for example, but your burden is to show that you did, in fact, rely on these reasons other than sex. And that has not been disputed by the plaintiff. They have not shown any evidence whatsoever that education and experience were not the two main items for the selection of Dr. Cable. They haven't shown that. And he meets both. And both are reasonably related to the mission of Alabama State University in its athletic program. And again, we put ourselves, Judge Wilson, in the fact of now the court is not a super-personnel review board. So if the court is not, juries now become super-personnel review boards? And again, the other question that we have to ask, and the evidence has shown, the job that the plaintiff left for was paying her $200,000. That's $65,000 more. So it's the market. And when you are looking for talent. She's saying that was the market, too, which is why you had to pay Mr. Cable. And you should have been paying her that, too. I mean, that's the theory of the case. How can you? She leaves. She's been asking for raises. And you just admit it. That was the market. And she was being paid below market. I want to make sure I understand one thing. I look at the job description. Yes, ma'am. Because a lot of emphasis is placed on the reason was education. But you had or terminal degree. You did amend it from or an MBA. You did amend it to an MBA or terminal degree. But you did not require a terminal degree. I know he had one. But the job description didn't require one, and it treated MBA, which he had, or terminal degree the same. I don't know where that gets us. But that seems because it was or, not requiring a terminal degree. At the end of the day, aren't we looking for candidates to apply? And that's all a part of the application process and the assessment process. You need an applicant pool. So if you just limit yourself to terminal degrees, that would eliminate someone. I agree it's better to put or. There's no doubt to expand the pool. But you're using the education that you considered optional as a reason to pay him or. That's all I'm saying. And, again, the heavy burden that the university has. Yes, it is your affirmative burden. Again, it has to be challenged and disputed. And you can't crawl with it. And I guess that's the point that I'm getting to. When you look at the potential applicant pools that you want to use to fill an athletic position, I think you're going to be hard-pressed to turn down someone who has been at the conference that you are a member of. Who? I think for a year. Yeah, I guess maybe I would agree with you that Mr. Cable deserved the $175,000. He deserves it. But the question is whether Ms. Williams deserved the $175,000. And that's the basis for her complaint. And just listen. If you put here and this is an HLSE. At that point in time, Alabama State was supposed to call Ms. Williams and say, Hey, listen, we got somebody now who will be negotiating $475,000. Wait a minute now. Didn't she ask for a raise several times? And it was always denied? It wasn't always denied, John, because it started off at $125,000. But she got the $135,000 pretty early on. I know. But, again, she got a signing bonus later on for $5,000, again, a single time. But she also had added incentives. And I would think that that could be viewed as good faith in trying to accomplish. What were the added incentives? Excuse me? What were the incentives? I think it could be the number of sports that you are champions in, to put it the correct way. And, most importantly, your grade point average for the student-athletes. That's a big thing nowadays. And there are other considerations that could be. Did you appear in a conference bowl game? You know, that would be along those lines. Was she ever given a raise at all? All she got was a $5,000 one-time signing bonus at one point, and that was it. Was she the third lowest paid athletic director in the entire Southwest Conference? Judge, doesn't that go to the type of money that you have? Prairie View has all wheels. Texas Southern has all wheels. But Cable was still the third. He was in the same position. You're not going to be able to pay the highest. I mean, that's not ASU's position. Some dynamics are just there. We're here in Alabama. Sounds like these are all arguments that ought to be made to a jury. But, Judge, at the end of the day, though, the question is, would we need a reasonable jury? And, again, we get back to the point. If courts are not going to be super personnel review boards with its ability to weigh the evidentiary burdens, a jury of eight people, how can they do it? Once again, your burden isn't to show that these are really good reasons to pay someone different. It's just to show that you had reasons that weren't sex, right? These were true reasons. I've got the affidavit from, I believe it's Dr. Roll, Kevin Roll, and he explains the process he went through to try to determine who to hire and how the negotiations went and all that stuff. Is there any reason to believe that he's lying about the process that he went through to get a new person to be the athletic director? Not at all. And it is evidenced by the person who was hired. And so we get also back to other points, and that is my favorite one, is Nix versus Radoll. You can make a good decision, a bad decision, or what have you, as long as it's not influenced by discriminatory purpose. And there has been nothing, nothing he articulated to dispute what the issue is. When she was hired, the job posting said 125. Yes, ma'am. And was she hired at 125 and then received in 2018 the 135? Yes. Okay, so she got one raise after hiring. That's right. And then she got in 2019 a re-signing bonus of 5. 5,000. Okay, so that's really 140.  And she was only there two years. So some effort was made to accommodate her request. And depending on how well the... Is Mr. Cable still there or has he moved on to a better...  Well, I know, but he's still at ASU. He is. He'd be here if he went to ASU, right? Yes. Okay, I just wonder if he was still there. Yeah, he's still here. She says that I was not paid more, and I was told I should be happy with my pay. And her claim is based on I was paid less because of my sex. And then she testified in her deposition that there were comments about her sex, her body. And so these are all factors that a jury can take into consideration in determining whether or not her low pay was based on her sex, right? Judge, we still have to come to grips. Can a plaintiff just self-servingly testify that I was treated differently? I mean, thank God she's limited to that. Yeah, you can cross-examine her about that. Well, yeah, these are comments that she said that ASU staff members made to her. So that's absolutely fair game. Okay, but stay mindful. If that's the hostile environment she's working in, the university has a procedure for you to file and have that investigated. And at her level being an athletic director, she surely knew she could have gone to personnel and say that I am being treated in a hostile manner. There's nothing written. There's no email. There is nothing other than her own testimony. Well, that's definitely a jury argument. But, I mean, what's your best argument that something other than sex is what led her to be paid at $125 to $135? And, again, we get back to the point. The job was announced at his salary at $125 when she applied for it. And when you announced it at $125, you didn't know whether you were going to appoint a woman to it or a man or whatever. You just announced it at $125, right? It's just a posting that was circulated. And she happened to have been there. And why did you pay Mr. Cable more? I think that's what he's asking. What is your best argument about why he was entitled to $170? I think based on his education and his experience. And, again, can we really fault ASU for wanting to have someone that had worked in the conference office for two years we don't have to worry about compliance issues. We know all of the people to contact at the conference. And that's the most important thing. Knowing what your conference is going to do that governs you, I mean, I think it's a value to that. All right. We have your argument, Mr. Johnson. Thomas, it's been a pleasure. I'm sorry, Mr. Thomas. It's been a pleasure. Thank you all. And it's Ms. Johnston who preserves some time for rebuttal. Yes, thank you. A few things. With all due respect to Athletic Director Cable, he is not Nick Saban. Ms. Williams left because they would not pay her more. She did go from $125 to $135, and that was upon her going from Interim Athletic Director to assuming the official role as Athletic Director. Subsequent to that, as she performed as Athletic Director, she continuously requested pay increases. That is when she was told by Chief of Staff, no, be happy with what you have. She did testify, as you pointed out, to the gender-based comments that she was subjected to while she was there. The experience at the SWAG Conference, it's important to recognize Ms. Williams' accomplishment. She got Alabama State off of penalties while she was there and got them back in compliance. The question that I have that Alabama State has not answered is, what is the difference? It's a significant pay difference between $135,000 and $170,000. They don't explain how a doctorate degree in a not-preferred category justifies that. They also have to justify it, though, or just explain that that's what they relied on. I mean, they could have said, well, we hired him because, you know, he's cousins with somebody that we wanted to be friends with. I mean, it doesn't have to be, like, a good reason. It just has to be a reason, right? It has to be a true reason. Respectfully, it has to be related to the business. So in this position, for this case, it has to be related to performing the job duties. Well, it just says on a differential other than sex. I mean, that's what the statute says, that they have the obligation to show that they paid her a different amount than him based on a differential other than sex. But they have to correlate it with business. There's an asundry of cases that say you have to connect it. So you can't just say, well, we paid for this. Okay, what's one of those cases? Okay, if I may look at my notes. It sounded like there were a lot of them, so I'll just. And while I'm looking for that, I wanted to point out in the job descriptions, everything, examples of duties, the class title, the class code, are the same for both when athletic director Cable applied and when athletic director Williams applied. They changed it to negotiable. I will point out that, again, the minimum was a master's degree, and what was preferred was not a PhD as opposed to a master's, but the course of study. And that is sports management or sports administration. And that is what Ms. Williams' course of study was. All right. Oh, I'm running out of time. Thank you. Yep, you've run out of time. Thank you, and I'll be happy to speak on the cases. They are cited in our brief to the connectivity to the business. Thank you, Your Honor, for your time. All right, thank you. We'll see you again in a few minutes. Yes. Court will be in recess for 15 minutes. All rise.